# In the United States Court of Federal Claims

**FOR PUBLICATION**

No. 25-62T
(Filed: October 14, 2026)

| | |
|---|---|
| **SOUTHERN ARIZONA HEALTH SERVICES PHOENIX, LLC**, *Plaintiff*, v. **UNITED STATES**, *Defendant*. | ) |

*Justin H. DiLauro*, DiLauro Tax Law PLLC, Houston, TX, for plaintiff.

*Joseph R. Longenecker*, Trial Attorney, Tax Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for defendant. With him on the briefs were *Brett A. Shumate*, Assistant Attorney General; *Joshua Wu*, Deputy Assistant Attorney General; and *Jason Bergmann*, Assistant Director, Tax Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC.

## OPINION AND ORDER[1]

***BONILLA, Judge*.**

Southern Arizona Health Services Phoenix, LLC (SAzHS) seeks a tax refund of $202,925.80, plus interest, for the employment tax quarter ending September 30, 2021 (Q3 2021), attributed to the Employee Retention Credit (ERC) under section 2301 of the Coronavirus Aid, Relief, and Economic Security (CARES) Act, Pub. L. No. 116-136, 134 Stat. 281, 347–51 (2020) (codified as amended at 26 U.S.C. § 3134). Pending before the Court are the parties' cross-motions for summary judgment. Specifically, the parties seek to resolve the issue of liability, with SAzHS claiming eligible employer status and, conversely, the government arguing SAzHS's operations

[1] This case was transferred to the undersigned for adjudication on September 15, 2026, pursuant to Rule 40.1(b) of the Rules of the United States Court of Federal Claims (RCFC).

were not fully or partially suspended due to a qualifying government order. For the reasons below, SAzHS's motion is denied and the government's cross-motion is granted.

## BACKGROUND

SAzHS was a healthcare staffing agency in the Phoenix, Arizona metropolitan area. Spouses Matthew S. and Andrea A. Kolder founded the company in October 2020, during the coronavirus disease 2019 (COVID-19) pandemic. The company provided nurses and other healthcare professionals for temporary and long-term placement in fourteen independently owned nursing homes, skilled facilities, post-acute care facilities, and similar facilities.[2] Nursing staff, in particular, were typically scheduled for (and billed in) 12-hour shifts.

On June 21, 2021, the Occupational Safety and Health Administration (OSHA) promulgated an emergency temporary standard governing occupational exposure to COVID-19 in healthcare settings (Healthcare ETS). 86 Fed. Reg. 32376 (June 21, 2021) (codified at 29 C.F.R. pt. 1910, subpt. U (2021)); *see* Exec. Order No. 13999, 86 Fed. Reg. 7211 (Jan. 21, 2021), *revoked by* Exec. Order No. 14148, 90 Fed. Reg. 8237 (Jan. 20, 2025). The measure was designed "to protect healthcare and healthcare support service workers from occupational exposure to COVID-19 in settings where people with COVID-19 are reasonably expected to be present." 86 Fed. Reg. at 32376. The Healthcare ETS required, *inter alia*,

> healthcare employers to "develop and implement a COVID-19 plan," as well as policies to implement the Centers for Disease Control and Prevention's "Guidelines for Isolation Precautions"; to screen patients for COVID-19 symptoms upon entry; to provide for personal protective equipment [(PPE)] and physical distancing; to "limit the number of employees present during" procedures that generate aerosols; to implement cleaning and ventilation protocols; and to train employees on COVID-19.

*In re Nat'l Nurses United*, 47 F.4th 746, 751 n.2 (D.C. Cir. 2022) (quoting 29 C.F.R. § 1910.502). *See also* 29 C.F.R. § 1910.502(l) (requiring employers to remove employees who are COVID-19 positive, have been told by a licensed healthcare provider that they are suspected to have COVID-19, or have recently experienced certain COVID-19 symptoms). SAzHS employees reportedly followed the procedures

---

[2] In April 2025, the Kolders purchased a NEXTAFF franchise, which provides healthcare and commercial staffing services. *See NEXTAFF Announces New Ownership of Phoenix Staffing Offices*, Newswire (Apr. 10, 2025), *available at* https://perma.cc/BEN8-94VH; *see generally About Nextaff*, NEXTAFF.com, *available at* https://perma.cc/5HRM-A5HL. *See also* ECF 15-1 at 12 ("[SAzHS] . . . ended . . . around March/April 2025 . . . when we bought the [NEXTAFF] franchise. . . . There wasn't anything to roll over [from SAzHS to NEXTAFF].").

of the healthcare facilities in which they worked—facilities which were presumably subject to the Healthcare ETS.[3] To varying extents and consistent with the protocols of their assigned healthcare facilities, SAzHS employees donned and doffed PPE,[4] maintained six-foot physical distancing when feasible,[5] worked around physical barriers,[6] and otherwise followed rules and guidelines intended to minimize the spread of COVID-19.

The claimed burden of these precautions notwithstanding, SAzHS's business thrived during the COVID-19 pandemic. "[I]n 2021 during COVID," Mr. Kolder testified, "we were so busy trying to staff the buildings that I wasn't [trying to find more clients]." ECF 15-1 at 17. The company had all the clients it could handle, and COVID presented opportunities to expand the business within the existing client base. The demand for respiratory therapists during the pandemic, for example, "was one of the ways that [Mr. Kolder] . . . grew the business, or the business changed a little during COVID." *Id.* at 27–28. While the company typically scheduled nurses for 12-hour shifts, the healthcare facilities would pay for additional hours if they "needed [the nurses] to stay an extra couple hours." *Id.* at 23. There was such a shortage of healthcare workers "during COVID[]" that the healthcare facilities "never argued price. They just need[ed] . . . help." *Id.* at 43. By 2023, in contrast, Mr. Kolder "was trying to find more business, because we were out of COVID, and [he was] trying to grow the business through picking up more clients." *Id.* at 17.

SAzHS reportedly filed an IRS 941 (Employer's Quarterly Federal Tax Return) for Q3 2021 on or before the November 1, 2021 deadline, wherein the company

---

[3] *See* ECF 15-1 at 134 ("[T]he Maricopa County and the federal government requirements [were] . . . minimal requirement[s]. The facility might have a lot higher requirements, and if we're going in there and work, we have to work by what their requirements are."); ECF 15-3 at 18 ("[A]t different facilities you worked at—and I couldn't name what facility did what—they had their own policies and procedures. . . . So it was what the company policy was at the facility that I would be working at at that time.").

[4] *Compare* ECF 15 at 11 ("Plaintiff's employees were required to don PPE before entering, and doff it after leaving, each patient room—a process taking a couple of minutes per room, multiplied across the 15 to 30 patients a nurse saw each shift."), *with* ECF 15-1 at 124–25 ("[T]here were some buildings that asked us to . . . continue to use . . . PPE, like, can you save your masks and use it again tomorrow, because we don't have enough masks yet."), *and* ECF 18-2 at 53 ("[D]uring COVID, you were actually required to keep your PPE on, and then I would change it depending on if it got soiled, or if it tore . . . ."), *and id.* at 54 ("[F]or me, personally, working through COVID, I was extra cautious with PPE just because I did not want to get COVID . . . .").

[5] *Compare* ECF 15 at 10 ("The standard also mandated six-foot physical distancing where feasible . . . .), *with* ECF 15-1 at 88 ("[I]n our line of work, [w]e weren't really able to implement the physical distancing, because . . . you have to be within six f[eet]of a patient to do any type of work on them.").

[6] *Compare* ECF 15 at 10 ("The standard also mandated . . . physical barriers at fixed non-patient-care workstations . . . ."), *with* ECF 15-1 at 89 ("[Creating physical barriers] was just not . . . an option . . . in the health care space . . . .").

"did not claim the ERC tax credits."[7] ECF 1 at 13. Thereafter, on November 28, 2022, SAzHS filed an IRS Form 941-X (Adjusted Employer's Quarterly Federal Tax Return or Claim for Refund) seeking:

> to report and recover an overpayment of $202,925.80 relating to the [ERC] for qualified wages that it paid to employees during [Q3 2021]. The basis of this refund claim is that the ERC of $202,925.80 was not previously reported on the Form 941 for the quarter that was timely filed by [SAzHS], and [SAzHS] timely made all related employment tax deposits for that quarter. [SAzHS] had not computed the amount of the allowable ERC until 11/28/2022 and therefore we could not report the amount of the ERC on its original Form 941 that was timely filed.

ECF 1-2 at 5. Hearing nothing from the IRS, SAzHS filed this tax refund action on January 14, 2025.

## DISCUSSION

### I. Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). A genuine dispute exists where a reasonable factfinder "could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Material facts, in turn, are those "that might affect the outcome of the suit." *Id.* In deciding motions for summary judgment, the Court must draw all inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam)).

The moving party bears the initial burden to demonstrate the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). That burden can be met by showing "there is an absence of evidence to support the nonmoving party's case." *Dairyland Power Coop. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (citing *Celotex*, 477 U.S. at 325). "Once the moving party has satisfied its initial burden, the opposing party must establish a genuine issue of material fact and cannot rest on mere allegations, but must present actual evidence." *Long Island Sav. Bank, FSB v. United States*, 503 F.3d 1234, 1244 (Fed. Cir. 2007) (citing *Anderson*, 477 U.S. at 248). Summary judgment is warranted when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party . . . ." *Matsushita*, 475 U.S. at 587.

---

[7] The original tax filing was not included in the record presented.

II. Eligible Employer

The dispositive issue in this tax refund case is whether SAzHS qualifies as an "eligible employer" for Q3 2021 under the CARES Act, which defines the term as "any employer":

> (i) which was carrying on a trade or business during the calendar quarter for which the credit is determined . . . , and
>
> (ii) with respect to any calendar quarter, for which—
>
> > (I) the operation of the trade or business described in clause (i) is fully or partially suspended during the calendar quarter due to orders from an appropriate governmental authority limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to [COVID-19],
> >
> > (II) the gross receipts . . . of such employer for such calendar quarter are less than 80 percent of the gross receipts of such employer for the same calendar quarter in calendar year 2019, or
> >
> > (III) the employer is a recovery startup business . . . .

26 U.S.C. § 3134(c)(2)(A). SAzHS was undisputedly carrying on a trade or business during Q3 2021. The parties' dispute centers on whether SAzHS satisfies clause (ii)(I) of the definition (i.e., the "suspension-of-business prong").[8]

The suspension-of-business prong codified at § 3134(c)(2)(A)(ii)(I) melds three discrete statutory requirements: (1) a qualifying COVID-19-based government order (2) proximately caused (3) a full or partial suspension of the operation of a trade or business. *See I Health & Life Ins. Servs. v. United States*, __ Fed. Cl. __, No. 25-1315, 2026 WL 2148921, at *7 (Fed. Cl. July 23, 2026) (citing *Ne. Health Servs., LLC v. United States*, 181 Fed. Cl. 566, 574 (2026), *cited with approval in Sundancer Pools, Inc. v. United States*, 182 Fed. Cl. 246, 252 (2026)). To prove entitlement, an ERC claimant must satisfy all three requirements. Conversely, the government need only demonstrate there is no genuine dispute that the ERC claimant fails to meet any one

[8] SAzHS does not invoke the year-over-year reduction in gross receipts basis or claim recovery startup business status for ERC tax relief under subsections 3134(c)(2)(A)(ii)(II) and (III). SAzHS did not exist until October 2020, so it cannot qualify under 3134(c)(2)(A)(ii)(II) to receive a tax refund for the employment tax quarter ending September 30, 2021, because it has no gross receipts for the employment tax quarter ending September 30, 2020. *See* 26 U.S.C. § 3134(c)(2)(A) ("With respect to any employer for any calendar quarter, if such employer was not in existence as of the beginning of the same calendar quarter in calendar year 2019, clause (ii)(II) shall be applied by substituting '2020' for '2019'."). Because SAzHS did not claim recovery startup status, it has waived the argument. If it were to qualify, moreover, "the amount of the credit allowed . . . for any calendar quarter [would] not exceed $50,000." *Id.* § 3134(b)(1)(B).

of the requirements of the suspension-of-business prong. *Id.* (citing cases). In this case, even assuming the Healthcare ETS was a qualifying COVID-19-based government order, SAzHS fails to demonstrate the existence of a full or partial suspension of its business operations, let alone the requisite causal connection between the standard and a suspension of those operations.

A. Qualifying Government Order

Step one in a suspension-of-business assessment is identifying a qualifying COVID-19-based government order: "a government directive that, as a whole, carries enforcement authority or otherwise has the ability to compel a certain course of conduct through the imposition of binding requirements or repercussions for noncompliance." *Id.* (citation modified) (quoting *Ne. Health*, 181 Fed. Cl. at 575–76, *cited with approval in Tapestry Senior Hous. Mgmt., LLC v. United States*, No. 25-3419, 2026 WL 1831424, at *2 n.1 (D. Minn. June 25, 2026)). As statutorily prescribed, the order must also "limit[] commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to [COVID-19]." 26 U.S.C. § 3134(c)(2)(A)(ii)(I).

SAzHS relies exclusively on the Healthcare ETS. While the parties agree the OSHA standard was mandatory for healthcare facilities, it is not clear whether the Healthcare ETS limited commerce, travel, or group meetings. The Healthcare ETS provided general health-and-safety standards for how certain workplaces should respond to the COVID-19 pandemic. Such standards do not necessarily, in themselves, limit commerce, travel, or group meetings as contemplated under the suspension-of-business prong. *See Raam Constr. Inc v. United States*, No. 25-4681, 2026 WL 1864866, at *6 (C.D. Cal. June 23, 2026) ("At most, the COVID-19 Workplace Guidelines [issued by the County of Los Angeles Department of Public Health] required immediate exclusion of the positive individual from the workplace 'until they [met] all return to work criteria.' Thus, as it did not limit 'commerce, travel, or group meetings,' the COVID-19 Workplace Guidelines [was] not an order under section 3134." (alteration in original) (quoting 26 U.S.C. § 3134(c)(2)(A)(ii)(I))), *cited with approval in Sevillo Fine Foods LLC v. United States*, No. 25-273, __ F. Supp. 3d __, 2026 WL 2906452, at *5 (D. Utah Sept. 28, 2026).

"To limit" means more than merely "to affect" in some articulable way. When used as a verb, limit is defined as "to assign certain limits to," "to restrict the bounds or limits of," or "to curtail or reduce in quantity or extent." *Limit*, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/limit (last visited Oct. 12, 2026). Commerce encompasses a sweeping swath of human affairs and nearly every government order has some effect on it. *Cf. Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 189 (1824) (defining commerce as "a general term, applicable to many objects"); *Gonzales v. Raich*, 545 U.S. 1, 19 (2005) (finding "the regulation [of wheat and marijuana grown for home consumption] is squarely within Congress' commerce power because production of the commodity meant for home consumption, be it wheat

or marijuana, has a substantial effect on supply and demand in the national market for that commodity"). Travel connotes various contextual definitions including, relevant to the CARES Act, "to go from place to place as a sales representative or business agent." *Travel*, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/travel (last visited Oct. 12, 2026). A group meeting is similarly broad, defined as "a gathering of people for a common purpose (such as to discuss business)." *Meeting*, *id.*, https://www.merriam-webster.com/dictionary/meeting (last visited Oct. 12, 2026). A COVID-19-based qualifying limitation must thus cause an identifiable and meaningful restriction on or curtailment of commerce, travel, or group meetings. *See Sevillo Fine Foods*, 2026 WL 2906452, at *5 ("[A]n order does *not* limit commerce when it prescribes the conditions under which the same activity may continue at whatever volume the operator is able to achieve."). If "limit" is read so expansively as to mean having any effect at all, the threshold requirement serves no purpose. "A [judicially formulated] test that everyone passes is not a test at all." *Comm'r v. Groetzinger*, 480 U.S. 23, 34 (1987) (addressing whether full-time gambling is a "trade or business" for income tax purposes). The COVID-19-based government order must actually *limit* commerce (e.g., restrict in-person dining or retail sales, reduce in-house staffing, curtail in-person appointments), travel (e.g., reduce number of passengers on airplanes, trains, or buses), or group meetings (e.g., cap attendance at an assembly for religious worship). *See Sevillo Fine Foods*, 2026 WL 2906452, at *5 ("[A] governmental order 'limits' commerce, travel, or group meetings when it restricts the volume, scope, or occurrence of the activity—by capping capacity or throughput, closing a category of establishment or a line of business, prohibiting a class of transaction or gathering, or forbidding the activity outright." (footnote omitted)).

SAzHS does not substantively address this statutory requirement in its principal brief.[9] Then, in response to the government's focus on the company's thriving business throughout the pandemic—particularly during Q3 2021[10]—SAzHS contends the Healthcare ETS limited both commerce and group meetings. SAzHS characterizes interactions between healthcare professionals and caregivers and their patients and their visitors as "a gathering of persons for a commercial purpose" or "group meeting." ECF 21 at 13–14. It contends the Healthcare ETS "provide[d] for personal protective equipment and physical distancing," "limit[ed] the number of

[9] The government argues SAzHS waived its argument "that healthcare workers with COVID-19 had to be excluded from the workplace for a period of time" because it did not raise the argument in its principal brief. ECF 27 at 10. While far from a model of clarity, SAzHS's principal brief contended that "[a]mongst the various requirements, facilities providing direct patient care had to limit and monitor points of entry and screen all entrants," that "[a]n employee who tested positive at a facility was turned away and sent home for the quarantine period then in effect," and that SAzHS "experienced an increased number of employee 'call-offs' during the Tax Period at Issue . . . ." ECF 15 at 9, 13. In neither its principal brief nor in its response and reply brief, however, does SAzHS give any indication as to the magnitude of the referenced "call-offs" (either in general or, critical here, in Q3 2021).

[10] The government's argument in this regard goes to whether SAzHS experienced a partial suspension, addressed *infra*, not whether the Healthcare ETS limited commerce in general.

employees present during procedures that generate aerosols," and required "screening and limitation of persons entering the setting." *Id.* at 13 (quoting ECF 18 at 9). On this premise, SAzHS concludes: "A rule that dictates how many people may be in a room, how far apart they must stand, what must separate them, who may come in, and who must leave is a rule limiting [commerce and] group meetings." *Id.* at 14. The government counters that "an order does *not* limit commerce when it prescribes the conditions under which the same activity may continue at whatever volume the operator is able to achieve," ECF 27 at 13 (quoting *Sevillo Fine Foods*, 2026 WL 2906452, at *10–11), and that "it is unintuitive at best to call a medical operating team a 'group meeting,'" *id.* at 14. *See also Sevillo Fine Foods*, 2026 WL 2906452, at *5 ("[W]orkplace guidelines requiring the immediate exclusion of an infected individual 'did not limit commerce, travel or group meetings' and were therefore not qualifying orders." (citation omitted)). The government further maintains that the "limit on the number of people who can be present for aerosol generating procedures in 29 C.F.R. § 1910.502(g)(1) . . . leaves significant discretion about how many people can be present,"[11] and "none of plaintiff's identified modifications stem from the aerosol-generating procedure requirement." ECF 27 at 14.

Despite doubt that the Healthcare ETS satisfies the CARES Act's general requirement of "limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to [COVID-19]," 26 U.S.C. § 3134(c)(2)(A)(ii)(I), the Court need not resolve the issue. As explained below, the COVID-19-based OSHA standard did not cause a suspension—full or partial—of SAzHS's specific operations.

B. Causation

Step two is causation. "[E]ntitlement to the ERC under the suspension-of-business prong is limited to businesses that can show that a qualifying governmental order was both the factual and proximate cause of a full or partial suspension." *I Health*, 2026 WL 2148921, at *9 (quoting *Ne. Health*, 181 Fed. Cl. at 580). The context of the ERC compels interpreting "due to" as requiring both proximate and but-for causation because, alone, "a but-for causation standard would risk broadening the suspension-of-business prong such that employers could virtually always rely on it and would almost never have to rely on the decline-in-receipts prong," and "[a]n interpretation that permits one qualification requirement to supersede an alternative qualification requirement must be rejected." *Sundancer Pools*, 182 Fed. Cl. at 252 (citation modified) (quoting *Ne. Health*, 181 Fed. Cl. at 579–80). *See also JPM Rest., LLC v. United States*, No. 24-357, 2026 WL 561147, at *5 (E.D. Tenn. Feb. 27, 2026) (finding that "'due to' requires both factual and proximate causation—meaning that

[11] Specifically, the Healthcare ETS provides: "The employer must limit the number of employees present during the procedure to *only those essential for patient care and procedure support*." 29 C.F.R. § 1910.502(g)(1) (emphasis added).

the order must have been the 'but-for' cause and a foreseeable cause of the full or partial shutdown"), *appeal docketed*, No. 26-5281 (6th Cir. Apr. 1, 2026).

The Healthcare ETS was not the proximate cause of the proffered disruptions to SAzHS's business operations. SAzHS does not contend the OSHA standard forced the company to suspend any portion of its in-house operations. Mr. Kolder conducted "in-person interviews" as part of the company hiring process in the company's office space, which "stay[ed] open throughout 2021." ECF 15-1 at 46, 83. He insists he "tried to . . . abide by the rules as much as possible," *id.* at 47, but SAzHS does not claim any partial suspension of its in-house operations. Rather, SAzHS's claim is one step removed: the company's medical staff reportedly followed the health-and-safety protocols of their assigned facilities, regardless of whether the facilities instituted and enforced more (or less) stringent protocols than those included in the Healthcare ETS. On the record presented, it is not possible to determine the precise health-and-safety protocols each independent facility adopted during the COVID-19 pandemic, the overlap with the Healthcare ETS, whether the OSHA standard heightened or modeled preexisting protocols at the facilities, or whether the facilities generally enforced any heightened OSHA-based health-and-safety protocols—particularly during Q3 2021. Resolution of these issues is unnecessary.

According to SAzHS, its "operation consisted of supplying nurse-hours of licensed care at fourteen covered facilities." ECF 21 at 19; *accord id.* at 32 ("[SAzHS] was engaged during the third quarter of 2021 in a single trade or business, providing nursing and other healthcare professional staffing services to nursing homes, skilled nursing facilities, and post-acute care facilities."). The Healthcare ETS did not mandate a more-than-nominal change to this operation. Even insofar as the cited OSHA standard might have heightened the preexisting health-and-safety protocols implemented at the independent facilities to which SAzHS medical staff were assigned, SAzHS continued to supply nursing staff to the full complement of their clients' facilities unabated. *See* ECF 15-1 at 15 (testimony of Mr. Kolder: "In 202[1], I was so busy trying to . . . staff the buildings that we already had contracts with or agreements with that I wasn't actively going out and trying to acquire new business. We had . . . enough . . . they were asking us for more help than we could provide.");[12] ECF 18-1 at 38 (testimony of Ms. Kolder that she was "not . . . aware of" any facilities SAzHS staffed suspending certain non-essential services, such as plastic surgery).

SAzHS maintains that COVID-19 precautions and protocols complicated and delayed patient care, reducing the number of patients who could be cared for per shift. But SAzHS charged by shift—not by patient—so any decline in the number of patients its employees saw per shift did not negatively impact the staffing agency's operations. SAzHS itself observes that the standard 12-hour shift did not change during the pandemic. ECF 15 at 30 ("12-hours unaltered between COVID-era and

[12] Mr. Kolder initially misspoke, saying 2021 when he meant 2023 and 2023 when he meant 2021. *See* ECF 15-1 at 17 ("Actually, it's flipped—it's flipped around.").

non-COVID times"). Even to the extent COVID-related disruptions may have caused SAzHS employees to work more than twelve hours in a single shift, Mr. Kolder testified he had no difficulty charging client facilities for the extra hours. He reported that when a facility told him it "needed [an SAzHS employee] to stay an extra couple hours," the facility would proactively reach out to him "to make sure that [the employee] reflects that on her time sheet." ECF 15-1 at 23. After a brief conversation, the facility would pay for the extra hours with "no problem." *Id.* In sum, the Healthcare ETS did not proximately cause the proffered disruptions to SAzHS's business operations.

C. Partial Suspension

Step three is determining whether the employer experienced a full or partial suspension of business operations during the calendar quarter for which the ERC is claimed.[13] Congress did not define "full or partial suspension." "In the absence of such a definition, [courts] construe a statutory term in accordance with its ordinary or natural meaning." *F.D.I.C. v. Meyer*, 510 U.S. 471, 476 (1994) (citation omitted). Looking to definitions in *Black's Law Dictionary* and *Merriam-Webster*, this Court defined "the ordinary meaning of the phrase 'partial suspension' of 'the operation of [an employer's] trade or business[]'" as "a cessation or discontinuance of part of the employer's business." *I Health*, 2026 WL 2148921, at *10 (quoting 26 U.S.C. § 3134(c)(2)(A)(ii)(I)). The Court then posed the follow-on question: "will any part suffice, no matter how small?" *Id.*

The Court pronounced the following standard for a qualifying partial suspension of business operations under the CARES Act:

> To satisfy the partial-suspension requirement, an employer must show that a discrete, more-than-nominal portion of its business ceased during the employment tax quarter at issue. Such suspensions may include, for instance, restaurants suspending in-person dining but continuing takeout and delivery service, retailers suspending on-premises shopping but continuing online sales, and construction companies suspending in-office operations but continuing onsite construction work.

*Id.* at *11; *accord Sundancer Pools*, 182 Fed. Cl. at 252 ("[T]he ordinary meaning of a 'partial suspension' of 'the operation of [a] trade or business' is a temporary interruption, postponement, or cessation of a more than nominal portion of a business's operations." (quoting 26 U.S.C. § 3134(c)(2)(A)(ii)(I))); *Tri-State Mem'l Hosp. v. United States*, No. 25-181, 2026 WL 1497190, at *4 (E.D. Wash. May 28, 2026) ("[A] 'partial suspension' is a temporary delay, interruption, or termination of a more than nominal portion of an employer's business."). These practical definitions are intended to capture both a discrete part of a business (e.g., in-person dining

[13] SAzHS claims it suffered a partial rather than a full suspension of its operations.

versus takeout or delivery) and a specific portion of a business (e.g., reduced restaurant capacity or hours of operation)—so long as the claimed part or portion is more than nominal (i.e., identifiable and meaningful).

Rather than identify the suspension of a discrete part or specific portion of its business, SAzHS proposes a less restrictive legal standard. SAzHS avers that this Court's recent decisions ascribe to a more "overly-restrictive interpretation of an ERC partial suspension than was otherwise intended by Congress in passing the original text in the CARES Act." ECF 15 at 18–19 (citing cases). In support, SAzHS makes a grammatical argument: "Congress could have written 'suspended in part,' or 'a portion of the operation . . . is suspended,'" ECF 21 at 27, but chose the phrase "partially suspended." *See* 26 U.S.C. § 3134(c)(2)(A)(ii)(I). While facially appealing, the argument fails under the weight of the very authority SAzHS cites. The *Oxford English Dictionary* defines "partially" as "to some extent; incompletely, restrictedly; *partly*." *Partially*, *Oxford English Dictionary*, *available at* https://perma.cc/6FCR-4SNR (emphasis added), *quoted at* ECF 15 at 19. The *Merriam-Webster Dictionary*, in turn, defines "partially" as "in some measure or degree," and lists "partly" as a highly relevant synonym. *Partially*, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/partially (last visited Oct. 12, 2026), *quoted at* ECF 15 at 19. If there is a material difference in meaning between "partly suspended" and "suspended in part," it escapes the notice of the Court. *See Partly*, *Oxford English Dictionary* ("With respect to a part; in part; in some degree or measure; to some extent; not wholly."), *available at* https://perma.cc/KDY8-Z8Y3; *Partly*, *Merriam-Webster* ("in some measure or degree : PARTIALLY"), https://www.merriam-webster.com/dictionary/partly (last visited Oct. 12, 2026).[14]

Further disquisition into the semantic differences between partially and partly is not required to resolve the present case. No part (or portion) of SAzHS's business ceased during Q3 2021. *See* ECF 18-1 at 48 (Ms. Kolder answering "No." to the following: "Do you know if [SAzHS] . . . made any changes to its business due to COVID-19 during the third quarter of 2021?" and "Do you know if [SAzHS] needed to make any changes to its business because of a governmental order of some kind during the third quarter of 2021?"). In fact, as noted above, SAzHS's healthcare staffing agency thrived both operationally and financially throughout the COVID-19 pandemic.[15] *Cf. Tri-State*, 2026 WL 1497190, at *5–7 (ERC partial suspension found

---

[14] The same holds true for SAzHS's claim that "partially suspended" should not be interpreted as meaning a "portion is suspended." ECF 15 at 20. *See Portion*, *Oxford English Dictionary* ("The part of anything allotted or belonging to one person; a share; an appointed task, duty, or the like. . . . A part of any whole; a section, a division; a proportion, a fraction."), *available at* https://perma.cc/R8MM-5B9F; *Portion*, *Merriam-Webster* ("an often limited part of a whole"), https://www.merriam-webster.com/dictionary/portion (last visited Oct. 12, 2026).

[15] Because SAzHS is not claiming qualification under § 3134(c)(2)(A)(ii)(II), the Court's analysis is not based on SAzHS's revenue. The thriving state of the business during the pandemic, however, underscores the absence of any partial suspension of its operations.

where hospital was "forced to cancel non-urgent services, surgeries, and procedures when surge limits were exceeded" (citation omitted)).

SAzHS's claimed entitlement to ERC tax relief is instead based, *inter alia*, on temperature checks, COVID-19 testing, and repeatedly donning and doffing PPE. But as explained in *I Health*: "Although the ERC 'provided significant, widely available relief to businesses who . . . involuntarily or at the cost of their bottom line' suspended their operations, it would strain the bounds of reason to interpret the ERC as providing 'significant' relief to offset insignificant costs." 2026 WL 2148921, at *11 (quoting *Ne. Health*, 181 Fed. Cl. at 584). This conclusion is consistent with the same IRS guidance SAzHS cites in support of its claim:

> The mere fact that an employer must make a modification to business operations due to a governmental order does not result in a partial suspension unless the modification has more than a nominal effect on the employer's business operations. Whether a modification required by a governmental order has more than a nominal effect on the business operations is based on the facts and circumstances. A governmental order that results in a reduction in an employer's ability to provide goods or services in the normal course of the employer's business of not less than 10 percent will be deemed to have more than a nominal effect on the employer's business operations. . . .
>
> Modifications altering customer behavior (for example, mask requirements or making store aisles one way to enforce social distancing) or that require employees to wear masks and gloves while performing their duties will not result in more than a nominal effect on the business operations.

*Guidance on the Employee Retention Credit under Section 2301 of the Coronavirus Aid, Relief, and Economic Security Act*, I.R.S. Notice 2021-20, 2021-11 I.R.B. 922 (2021), *quoted in part at* ECF 1 at 5–6, *and* ECF 15 at 26–27, *and cited at* ECF 21 at 22.[16] *See also Sundancer Pools*, 182 Fed. Cl. at 252 ("Indeed, all businesses were required to modify their workplace practices and working conditions to some extent during the pandemic. Therefore, Congress must have required that—to establish its eligibility for the ERC—an employer must demonstrate something more than that its normal operations were disrupted by implementing such modifications." (citation omitted)).

[16] Although this Court declined to adopt the IRS guidance interpreting the phrase "orders from an appropriate governmental authority" in the CARES Act, *see Ne. Health*, 181 Fed. Cl. at 576 n.20, the above-quoted reasoning regarding "a more than a nominal effect on business operations" is well-taken.

The exclusion of COVID-19-positive employees[17] from the workplace may have had a comparatively more significant effect on SAzHS's operations, but it is likewise not sufficient to establish ERC employer eligibility.[18] *See Raam Constr.*, 2026 WL 1864866, at *6 (finding that "COVID-19 Workplace Guidelines requir[ing] immediate exclusion of the positive individual from the workplace 'until they [met] all return to work criteria[]' . . . . did not limit 'commerce, travel, or group meetings'" (second alteration in original) (quoting 26 U.S.C. § 3134(c)(2)(A)(ii)(I))); *accord Sevillo Fine Foods*, 2026 WL 2906452, at *7 ("[A]n order that removes individual workers from the workplace does not amount to an order limiting the institution's commerce. The [state OSHA] ETS do not tell the port to move less cargo or to reduce operations and, as a result, the ETS do not qualify as orders that limit commerce within the meaning of the statute."). Requiring the exclusion of COVID-19-positive employees from the workplace does not limit commerce in general and, therefore, does not limit the commerce of any particular business.[19] Consequently, the exclusion of COVID-19-positive workers from the workplace is not a partial suspension under the CARES Act.

Other disruptions claimed by SAzHS were not the result of the Healthcare ETS at all. *Compare, e.g.*, ECF 15-1 at 69 (testimony of Mr. Kolder that "one of the big changes" SAzHS "had to adjust to" was "showing proof to the facilities that our employees were vaccinated"), *with* 29 C.F.R. § 1910.502(m) ("The employer must support COVID-19 vaccination for each employee by providing reasonable time and paid leave (e.g., paid sick leave, administrative leave) to each employee for vaccination and any side effects experienced following vaccination."). Some were the result of facility protocols made in response to general pandemic conditions

---

[17] For clarity, the Court uses "COVID-19-positive employees" as shorthand for SAzHS's collective references to employees who tested positive, were suspected of being positive, or were exposed to COVID-19.

[18] In *I Health*, this Court remarked:

> The government counters that I Health's decision to exclude workers cannot be fairly attributed to the qualifying government orders because the insurance agency likely would have excluded sick or COVID-19–exposed employees from the workplace even if the government had not ordered it to do so. . . . Perhaps the government's prediction is correct—and perhaps not. After all, I Health's focus was presumably on staying in business and maintaining its bottom line during the pandemic-induced economic crisis, whereas the state and local governments' primary concern was public health and safety.

2026 WL 2148921, at *10. But here, facility protocols, in addition to employer conscientiousness, are relevant to the question of causation. *See* ECF 15-1 at 69 ("It's the [COVID-19] test that the facility is providing. So they're the ones that are determining that [a COVID-19-positive employee] can't come in here.").

[19] Even construing the exclusion of COVID-19-positive employees as a partial suspension, insofar as "an order that removes individual workers from the workplace does not amount to an order limiting the institution's commerce," *Sevillo Fine Foods*, 2026 WL 2906452, at *7, any partial suspension *caused by* such an order is not *due to* a qualifying government order.

(e.g., enhanced monitoring of patient vital signs).[20] SAzHS alleges its "operational modifications" included "additional patient care . . . and other operational complications existing in such a sensitive health care environment such as nursing facilities, long-term care facilities, and rehabilitation facilities, where the most vulnerable and susceptible as to COVID-19 were being treated by [SAzHS's] employees and their operations." ECF 15 at 31. The pandemic was a traumatic time for many Americans, particularly among certain vulnerable populations and the healthcare workers who cared for them. The difficulties faced by SAzHS employees, however, do not translate into ERC eligibility for their employer. The claimed additional patient care and operational complications arising out of the pandemic were not due to the Healthcare ETS; they were enhanced precautions implemented to provide safe and effective healthcare during a global pandemic. Moreover, some of the difficulties faced by SAzHS employees translated into more—not less—business for their employer. As the government contends, decreasing the number of patients a nurse can care for in a 12-hour shift, for example, increases the demand for more nurses and extended shifts (i.e., the very business offered by a healthcare staffing agency).

At bottom, SAzHS has not demonstrated that a more-than-nominal part or portion of its business ceased during Q3 2021. Having failed to satisfy its burden of proof, the healthcare staffing agency does not qualify for ERC tax relief.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for partial summary judgment (ECF 15) is **DENIED**, and defendant's cross-motion for summary judgment (ECF 18) is **GRANTED**. The Clerk of Court is directed to **ENTER** judgment accordingly.

It is so **ORDERED**.

Armando O. Bonilla
Judge

[20] *See* ECF 15-3 at 17–18 ("Q: . . . [W]hen you refer to COVID restrictions, what are you talking about in this context? A: Well, to be honest with you, at different facilities you worked at . . . they had their own policies and procedures. For example, one place would want you to take vital signs every two hours and another place might only require it every four hours. So it was what the company policy was at the facility that I would be working at at that time.").